UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KENNETH LEE MORGAN                    CIVIL ACTION

VERSUS                                NO. 14-0814-KDE-SS

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

The plaintiff, Kenneth Lee Morgan ("Morgan"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423.

## PROCEDURAL HISTORY

On August 31, 2010, Morgan submitted an application for benefits. He reported that he became disabled on June 25, 2009. R. 143-147. He reported an injury to his back and left shoulder and a problem with his leg. R. 169. On October 29, 2010, his application for benefits was denied. R. 59-69.

On January 5, 2012, there was a hearing before Administrative Law Judge Elizabeth Palacios. R. 33-57. Morgan was represented by council. The ALJ secured a consultative examination from Brett Rothaermel, M.D., dated May 22, 2012. On June 12, 2012, the ALJ notified Morgan that she proposed to enter Dr. Rothaermel's report into the record. R. 206-08.

At the request of the ALJ, a vocational expert responded to an interrogatory based on evidence provided to her. R. 209-15 and 218-22. On August 6, 2012, the ALJ notified Morgan that she proposed to enter the expert's interrogatory response into the record. R. 223-224.

On November 8, 2012, the Chief ALJ Michael Hertzig issued an unfavorable decision, noting that ALJ Palacios was unavailable to render a decision.  R. 11-32.  Chief ALJ Hertzig reviewed the record and the prior hearing and found no need to conduct a supplemental hearing.  ALJ Palacios authorized ALJ Hertzig to sign the decision.  R. 27.[1]  On February 18, 2014, the Appeals Council denied the request for review.  R. 1-4.

On April 9, 2014, Morgan filed a complaint in federal court for review of the Commissioner's decision.  Rec. doc. 1.  The Commissioner filed an answer and the administrative record.  Rec. docs. 10 and 11.  The parties filed cross-motions for summary judgment.  Rec. docs. 15 and 16.

## STATEMENT OF ISSUES ON APPEAL

Issue No. 1.    At step two, did the ALJ err in finding that Morgan's shoulder impairments were not severe within the meaning of the Act.

Issue No. 2.    Did the ALJ err in making a credibility assessment?

Issue No. 3.    Did the ALJ err in considering the evidence of the treating physician?

Issue No. 4.    Did the ALJ err in declining to submit Morgan's interrogatories to the vocational expert?

Issue No. 5.    Did the ALJ err in failing to consider a closed period of disability?

Issue No. 6.    Did the ALJ err in the finding of Morgan's residual functional capacity and his ability to obtain and maintain employment?

Issue No. 7.    Was there substantial evidence supporting the availability of jobs in significant numbers at step five?

## THE COMMISSIONER'S FINDINGS

The ALJ made the following findings:

1.  Morgan met the insured status requirements of the Act through December 31, 2014.

---

[1] The decision issued by Chief ALJ Hertzig will be referred to as the "ALJ's decision."

2

2.  Morgan has not engaged in substantial gainful activity since June 25, 2009, the alleged onset date (20 C.F.R. § 404.1571 et seq.).

3.  Morgan has the following severe impairments:  disorder of the back, substance addiction disorder, and affective disorder (20 C.F.R. §§ 404.1520(c)).

4.  Morgan does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5.  Morgan has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except he can lift and carry up to twenty pounds continuously (over two-thirds of an eight-hour workday) and lift and carry twenty-one to fifty pounds occasionally (up to one-third of an eight-hour workday).  The claimant can sit, stand, and walk for four hours at a time for a maximum of eight hours in an eight-hour workday.  He can continuously use his hands for all reaching, handling, fingering, feeling, pushing, and pulling and continuously use his feet for operation of foot controls.  Further, Morgan can continuously perform climbing of stairs and ramps and balancing.  He can occasionally perform climbing of ladders and scaffolds, stooping, kneeling, crouching, and crawling. Additionally, Morgan can tolerate continuous exposure to unprotected heights, moving mechanical parts under fifty pounds in weight, operating a motor vehicle, humidity, wetness, extreme heat, dust, odors, fumes, pulmonary irritants, and loud noise, such as a jackhammer.  He can tolerate only occasional exposure to extreme cold and vibrations. Morgan is further limited to the performance of simple, routine, repetitive tasks, or unskilled work.  He can have occasional interaction with co-workers, supervisors, and the

public.  He can have no fast-paced production requirements and only occasional changes in the work setting.

6.  Morgan is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7.  Morgan was born in 1969 and was 40 year old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

8.  Morgan has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Morgan is "not disabled," whether or not Morgan has transferable job skills (See SSR 82-14 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering Morgan's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Morgan can perform (20 C.F.R. §§ 404.1569 and 416.1569(a)).

11. Morgan has not been under a disability, as defined by the Act, from June 25, 2009, through the date of this decision (20 C.F.R. § 404.1520(g)).

R. 16-26.

## ANALYSIS

a.  **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448,

452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461.  Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step

evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez v. Barnhart, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).  When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.  "In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions;

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

(3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history." Perez v. Barnhart, 415 F.3d at 462. "The Commissioner, rather than the courts, must resolve conflicts in the evidence." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

b. **Testimony at Hearing.**

The ALJ reported that a consultative physical examination would be obtained, possibly by an orthopedist. R. 37.

Morgan had worked as an auto glass technician. R. 38. He was required to lift 100 to 150 pounds with assistance. R. 38. He was involved in an accident at work on June 25, 2009. R. 38. His worker's compensation case was settled for $95,000. R. 38. The settlement was based on lost wages for a period of time with some medical reimbursement. R. 39.

Since the accident he was unable to do things like sit still or stand for long periods of time or lift his granddaughter. R. 40. An operation in September 2012 did not help. R 40. He went to physical therapy following back surgery, but it did not help. R. 40. His doctor told him that he may need pain management for the pain in his legs. R. 40-41. His doctor was not prescribing pain medication. R. 41-42. Morgan had an MRI after October 2011. R. 42. He did not know the results. R. 42.

In a typical day, Morgan got up at 10:00 a.m., showered, watched TV and got comfortable. He sat for a little while watching TV, lay down, and moved around. R. 44. He was married. His five year old granddaughter lived with him. His wife did not work. R. 44. He could wash and fold clothes and wash dishes. R. 44. He could not sit or stand for more than 20 to 30 minutes before he needed to take a break. R. 45. He needed about 5 minutes to walk around before he could return to sitting or standing. R. 45. He could walk no more than 2

blocks before he needed a break.  R. 45.  The most he could carry was 20 pounds.  R. 45.  He

would lie down on a recliner.  R.46.

Morgan stopped taking medicine about two months before the hearing.  R. 47.  He took

non-prescription medication like Tylenol.  R. 47.  His back hurt the most.  R. 47.  He felt back

pain all the time.  R. 47.  The pain was about an eight on a ten point scale.  With prescription

medication, it was about a two.  R. 48.

The ALJ asked Morgan's lawyer to try to obtain additional records from a doctor.  R. 49.

Morgan received treatment from the Jefferson Parish Mental Health facility.  R. 51.  He

was diagnosed as manic depressive.  R. 52.  He was depressed all the time.  R. 52.  His

depression problems started when he was nine.  R. 52.  The depression became worse after the

accident.  R. 52.  He took Prozac, BuSpar and Latuda.  R. 53.  He experienced mood swings.  R.

53.  He had problems relating to other people.  R. 53.

Morgan had surgery for his shoulder.  R. 54.  He could not lift anything because his

shoulder would give out.  He had pain in the shoulder.  R. 54.  The shoulder surgery was more

successful than the back surgery.  R. 54.

Morgan had completed the ninth grade.  R. 54.  He had some vocational technical

training but did not receive a certificate.  R. 54.

About once or twice a week, Morgan had stabbing pain in his leg.  R. 55.  It lasted about

half an hour.  R. 55.  When he tried to walk, he felt his leg give out.  R. 55.  He denied abusing

drugs at the time of the hearing.  R. 55.

c.     **Medical Evidence**.

**2005**

Morgan was admitted to East Jefferson General Hospital ("EJGH") in July 2005.

The nursing staff noted issues with his requests for pain medication, smoking, leaving the room, and attempting to leave the hospital for cigarettes.  R. 712, 713, 720, 728, 732, 735.  X-rays of the lumbar spine on July 9, 2005 revealed no evidence of fracture or subluxation.  The impression was mild multilevel degenerative disc space and facet arthropathy.  R. 574.  A CT of the head without contrast on July 16, 2005 at EJGH revealed no skull fracture or acute intracranial post-surgical changes.   The impression was post-left craniotomy with mild underlying post-surgical changes.  R. 573.  A July 16, 2005 MRI of the lumbar spine without contrast was normal.  R. 570.  At discharge he was given instructions on diet, use of Coumadin, and anticoagulant therapy from the cardiac rehab department.  R. 750-53.

## 2006

On December 13, 2006, Morgan went to the emergency room ("ER") at EJGH after injuring his left hand with a knife when he was trying to pry apart frozen meat, the knife slipped and punctured his left hand.   X rays showed no acute trauma.   Keflex and Vicodin were prescribed. R. 910-11.[2]

## 2007 and 2008

The administrative record does not contain any medical records for 2007 and 2008.

## 2009

On June 25, 2009, Morgan was admitted to the North Oaks Medical Center in Hammond ("North Oaks").  R. 234.  He was seen by Dr. John B. Guidry, M.D.  R. 240.  Morgan reported that he fell approximately four to five feet from an 18-wheel truck and hit the back of his head. He was unable to walk after the fall.  He complained of pain in his left hip and lower back pain. Lortab and Morphine were prescribed.  No acute intracranial abnormalities were observed on a CT scan of the head.  The x-rays of the cervical spine, lumbar spine and left hip did not reveal

---

[2]  The records of this ER visit at EJGH are R. 908-922.

any acute fracture.  He was given crutches.  R. 235-38.  It was recommended that he follow-up with his family doctor.  R. 239.

A June 25, 2009 CT angiography of the head revealed mild atherosclerotic changes.  An aneurysm was not identified.  R. 241.  The lumbar x-ray revealed mild narrowing and scleroris involving the facet joints from L3 to S1.  The impressions were lumbar spondylosis and facet arthritis in the lower lumbar spine.  R. 245.  The x-rays of the cervical spine and left hip did not reveal any significant abnormality.  R. 246-47.

On July 11, 2009, Morgan was seen at the ER at EJGH with complaints of persistent low back pain.  He was out of pain medication.  Vicodin, Norflex and Ibuprofen were prescribed.  He was ambulatory with a slow gait.  He had positional pain.  There was tenderness and decreased range of motion of the lumbar spine.  There was full flexion and no midline tenderness for the neck.  The straight leg test was negative.  The doctor recommended rest at home, return to North Oaks for further evaluation, and no work.  R. 332 and 1280.[3]

On July 15, 2009, Morgan was seen at the ER at EJGH with complaints of severe back pain.  He was given 100mg of Demerol and 50mg of Phenergan IM for pain.  Pain medication, including Percocet, was prescribed.  He was to see an orthopedist.  R. 334-36 and 1253-54.  The impression from a July 15, 2009 x-ray of the dorsal spine at EJGH was degenerative disc disease with no evidence of fracture or subluxation.  R. 572.  The impression of July 15, 2009 x-rays of the lumbar spine was mild multilevel degenerative disc space and facet arthropathy.  There were no significant changes from July 9, 2005.  R. 571 and 1261.[4]

From July 17, 2009 through January 8, 2010, Morgan was seen at the Injured Worker's Clinic on Williams Boulevard in Kenner ("IWC").  R. 401-505.  By January 8, 2010 it changed

---

[3]  The records of this ER visit at EJGH are R. 1270-1294.
[4]  The records of this ER visit to EJGH are R. 1244-69.

10

its name to the Advanced Medical Care & Wellness Center. R. 468. Reports were sent from the physicians to Morgan's counsel. During this time, Morgan was seen for physical therapy more than 30 times. There were at least two visits in July (R. 434-35), six in August (R. 428-33), two in September (R. 426-27), nine in October (R. 417-25), four in November (R. 412-15), seven in December (R. 405-11), and two in January (R. 403-04).

On July 17, 2009, Morgan was seen by Samuel Greenberg, M.D. at IWC. Morgan complained of low back pain with radiation into the buttocks and posterior thighs, and neck and shoulder pain. The diagnosis was cervical and lumbar spinal sprain/strain. Lorcet and Parafon Forte were prescribed. He was scheduled for conservative therapy of about three visits per week for four weeks. It included joint mobilization, electrical muscle stimulation and neuromuscular re-education. R. 500-05.

On August 4, 2009, Morgan was seen at the ER at EJGH with complaints of back pain. The diagnosis was lumbar strain with chronic back pain. Flexeril and Percocet were prescribed. He was to follow-up with an orthopedist or neurosurgeon for further care. R. 337-38 and 1228-29.[5]

On August 7, 2009, Morgan was seen by Dr. Greenberg at IWC. The diagnosis was cervical and lumbar spine sprain/strain. Vicodin and Norflex were prescribed. He was instructed to continue conservative therapy. R. 486-87 and 494-96.

On August 27, 2009, Morgan was seen at the ER at EJGH with complaints of back pain. He stated that he ran out of pain medication prescribed by his primary care doctor. He was unable to obtain a refill. He was given an injection of morphine and Phenergan. He was to follow-up with his primary care doctor and a specialist. R. 339-40 and 1205-06.[6]

---

[5] The records of this ER visit to EJGH are R. 1220-43.
[6] The records of this ER visit to EJGH are R. 1198-1219.

On August 29, 2009, Morgan returned to the ER at EJGH.  He reported severe chronic back pain after he ran out of his Lortab two days earlier when he helped someone load a U-Haul. He took more Flexeril and Klonopin than he should have with no intention of suicide.  There was family stress over financial matters.  He tested positive for cocaine and marijuana on a urine screen.  He had smoked marijuana every day for the last 25 years.  He used cocaine the day before he came to the hospital.  He complained of depression.  He was admitted to the hospital. He was given Prozac, BuSpar and Flexeril.  The discharge diagnosis was:  Axis I – major depression, opiate dependence, and cannabis abuse; Axis II – none; Axis III – chronic back pain; Axis IV – moderate; and Axis V – on admit 50, highest in past year 70.  It was recommended that he go to a substance abuse clinic as soon as possible.  R. 341-56 and 611-14, 1297, 1330-31 and 1343-44.[7]

While in the hospital, Morgan reported that:  he was born and raised in Metairie; his father died when he was very young; after his father died he went to counseling; he quit school in the tenth grade because he was drinking, smoking marijuana and chasing girls; when he was a teenager he was in trouble with the law for public intoxication, criminal trespass and theft; he was married five times; he was widowed once; he was married twice to the same person; he had been with his current wife for two years; he had one daughter who lived in Alabama with her mother; he was on disability; he denied legal problems; and he reported financial issues and marital problems.  R. 346.

On August 31, 2009, Morgan was discharged from EJGH with an after-care referral to Eric Kramer, M.D., a psychiatrist, for an initial evaluation.  The diagnosis reported by EJGH was:  Axis I diagnosis – mood disorder and polysubstance dependence; and Axis II diagnosis – diagnosis deferred.  Morgan obtained his medication on a Wal-Mart plan.  Dr. Kramer worked at

---

[7]  The records of this ER visit to EJGH are R. 1295-1456.

the Jefferson Parish Human Services Authority clinic on the East Bank ("JPHSA Clinic").  It scheduled him to see Adrienne Rynning, LCSW, on September 8.  R. 249-50 and 1626-27.

On September 4, 2009, Morgan was seen by Dr. Greenberg at IWC.  The diagnosis was cervical and lumbar spine sprain/strain.  Lorcet and Zanaflex were prescribed.  He was instructed to continue conservative therapy.  R. 483-85 and 491-93.

On September 8, 2009, he rescheduled his JPHSA Clinic appointment.  R. 250.  On September 17, 2009, he called JPHSA Clinic and reported that he could not make the appointment because of car trouble.  He was rescheduled.  R. 250.

On September 21, 2009, Morgan was seen by Warren R. Bourgeois, M.D., an orthopedist with Audubon Orthopedics and Sports Medicine.  The chief complaints were pain in the head, back, knee, neck and left shoulder.  Physical therapy was not helping.  R. 283 and 543.  Dr. Bourgeois reported that Morgan was unable to return to work because of his physical condition. R. 305.

From September 21, 2009 through January 24, 2011, Dr. Bourgeois provided reports to Summit Consulting.  R. 305, 519, 533.[8]

On October 1, 2009, there was an MRI of the cervical spine at the request of Dr. Bourgeois.  The impression was mild cervical scoliosis convex to the right.  The MRI was otherwise negative.  The impression for the left shoulder was a torn rotator cuff.  R. 575-76.

On October 10, 2009, Morgan went to the ER at EJGH with facial pain over the right jaw associated with pain on the right lower molar.  He was given Vicodin and Clindamycin.  He was to see a dentist.  R. 357 and 894.[9]

---

[8]  The reports were on October 19, 2009 (R. 304 and 532), December 7, 2009 (R. 302-03 and 530-31), January 18, 2010 (R. 301 and 529), February 17, 2010 (R. 300 and 528), February 25, 2010 (R. 298-99 and 527), March 29, 2010 (R. 297 and 525), April 26, 2010 (R. 296 and 524), May 13, 2010 (R. 295 and 523), July 15, 2010 (R. 294 and 522), November 1, 2010 (R. 521), November 18, 2010 (R. 520), and January 24, 2011 (R. 519).

On October 16, 2009, Morgan failed to show at JPHSA Clinic for a psychiatric diagnosis interview exam.  R. 250.

On October 16, 2009, Morgan was seen by Jerome Kurpel, M.D., at IWC.  He continued to complain of pain in his neck, low back and left shoulder.  Feldene, Robaxin and Vicodin were prescribed.  He was to continue conservative therapy and obtain an MRI of the cervical spine and left shoulder.  R. 477-79.

On October 19, 2009, Morgan was seen by Dr. Bourgeois.  He had cuff tendonitis in the left shoulder.  R. 284 and 544.  Dr. Bourgeois reported that Morgan was unable to return to work because of his physical condition.  R. 304.  Dr. Bourgeois planned for an injection in the left shoulder and physical therapy for all areas.  R. 532.

On October 30, 2009, Morgan was seen by Dr. Kurpel at the IWC.  He reported decrease in the low back pain with the medication.  Feldene, Zanaflex and Vicodin were prescribed.  He was to continue conservative therapy.  R. 474-76.

On December 7, 2009, Morgan was seen by Dr. Bourgeois.  He had chronic cuff tendonitis and bursitis.  He needed a left shoulder arthroscopy and an MRI of the lumbar spine.  R. 285, 518 and 531.  Dr. Bourgeois reported that Morgan was unable to return to work because of his physical condition.  R. 302-03.

On December 11, 2009, Morgan was seen by Dr. Kurpel at IWC.  He reported increased pain and spasm in the low back with radiating pain down the right lower extremity.  Feldene, Robaxin and Vicodin were prescribed.  He was to continue conservative therapy.  R. 471-73.

The impression of a December 29, 2009 MRI of the lumbar spine was mild midline or central disc protrusion at L2-L3 through L4-L5 levels which contacted the thecal sac without

---

[9]  The records from EJGH for this ER visit are R. 887-907.

evidence of nerve root or thecal sac compression; and mild angular bulge at L2-L3 and L3-L4 discs resulting in no thecal sac compression.  R. 307-08 and 554-55.

**2010**

On January 8, 2010, Morgan was seen by Dr. Kurpel at ICW (now Advanced Medical Care & Wellness Center).  He reported pain in his low back and left shoulder and stiffness. Robaxin and Vicodin were prescribed.  He was to follow-up six weeks after the left shoulder surgery set for January 19, 2010.  R. 468-70.

On January 18, 2010, Morgan was seen by Dr. Bourgeois for a pre-op appointment.  R. 285 and 518.  He reported that Morgan was unable to return to work because of his physical condition.  R. 301.  Dr. Bourgeois anticipated maximum medical improvement for the left shoulder within six months.  R. 529.  On January 19, 2010, Dr. Bourgeois performed surgery to repair Morgan's right rotator cuff.  R. 562-63.

On January 25, 2010, Morgan was seen at the ER at EJGH for left shoulder pain post-rotator cuff surgery.  Percocet was prescribed.  He was discharged in stable condition.  R. 358-59 and 876-77.[10]

On February 1, 2010, Morgan was seen by Dr. Bourgeois for a post-op appointment.  He complained of pain in the left shoulder.  An MRI revealed a L4-L5 disc protrusion.  He was to return in one month.  R. 287, 516 and 528.  Dr. Bourgeois reported that Morgan was unable to return to work because of his physical condition.  R. 300.

On February 9, 2010, Morgan was evaluated for physical therapy for his shoulder.  R. 564-67.

---

[10]  The records for this ER visit to EJGH are R. 865-86.

On February 18, 2010, Morgan was seen at the ER at EJGH with complaints of back pain.  He reported that he was out of pain medication.  Dilaudid, Phenergan and Norco were prescribed.  R. 361-62, 568-69 and 851-52.[11]

On February 25, 2010, Morgan was seen by Dr. Bourgeois.  The left shoulder was improving.  His back pain was his major symptom.  He was referred to pain management.  R. 288 and 515.  Dr. Bourgeois recommended P.T. for the left shoulder and lower back and a referral to pain management.  R. 527.  He also reported that Morgan was unable to return to work because of his physical condition.  R. 298-99.

On March 10, 2010, Morgan went to a CVS for medication.  A prescription for Hydrocodone was faxed to the pharmacy by Dr. Bourgeois.  R. 289 and 514.

On March 15, 2010, Morgan was seen by Kevin Martinez, M.D. at Parish Pain Specialists for an evaluation on a referral from Dr. Bourgeois.  Morgan related the history of the July 2009 accident.  He denied any illicit drugs or any alcohol.  Dr. Martinez reported a disc herniation at L4-L5.  He recommended an epidural injection.  R. 277-79, 560-61, 674-75, 683-84, 690-91, 1552-53, 1561-62 and 1568-69.

On March 16, 2010, Morgan reported to JPHSA Clinic that he was out of medication.  It was more than six months since he had been to the Clinic.  He was given an appointment with the social worker, Ms. Rynning, for March 24, 2010.  R. 250.  On March 24, 2010, Morgan failed to appear for his JPHSA Clinic appointment.  R. 250.  On March 24, 2010, Dr. Bourgeois faxed a prescription refill for Hydrocodone to Morgan's pharmacy.  R. 514.

On March 25, 2010, the day after his scheduled appointment, Morgan came to the JPHSA Clinic.  He reported that he had been out of medication for three days and wanted to get back on

---

[11]  The records for this ER visit to EJGH are R. 837-64.

the medication.  It was noted that he never followed up with the Medical Doctor or the Clinic when he was referred for after-care in September 2009.  The note states:

> He is denial of his addiction and denies using or drinking at all for at least 2 years. When confronted with the information he gave when he was last here in September he states that he's not drank or used since then [sic].  Except he drank at a wedding in November and he smokes MJ daily and he takes pain meds daily. He was told that he's scheduled to get SA treatment at the clinic.

R. 250 and 1653-54.  Morgan stated that he needed to see the doctor that day.  Dr. Kramer put him on standby and said he would have to wait, because he was no longer on after-care.  Morgan insisted on an appointment that day.  He came into the Clinic hallway yelling that he will "go off" if he did not have medication and it would be the Clinic's fault.  The Clinic offered to schedule an appointment but he left angrily.  R. 251.

Later in the day, Morgan called about psychotropic medication.  He reported that he was treated briefly at the psychiatric unit at EJGH in September 2009.  Prozac and BuSpar were prescribed.  He took them daily but had been out of medication for three days.  He denied any substance abuse.  He apologized for the trouble earlier in the day.  An appointment was made for him.  R. 251.

On March 29, 2010, Morgan was seen by Dr. Bourgeois.  R. 289.  The left shoulder was improved.  There was persistent low back pain.  Dr. Bourgeois was waiting on the outcome from epidural steroid injections.  R. 525.  He reported that Morgan was unable to return to work because of his physical condition.  R. 297.

On March 31, 2010, Morgan failed to show at JPHSA Clinic for an appointment.  R. 251.

On April 1, 2010, Morgan was seen by Dr. Martinez for a transforaminal epidural injection.  The injection gave him only partial benefit.  R. 276-77, 672-73, 681-82 and 688-89, 1150-51, 1159-60 and 1566-67.

On April 5, 2010, Morgan was seen at the EJGH ER for back pain.  A shot was given to him for pain, but the ER doctor refused to give him any narcotic pain refills.  His history showed visits to the ER since July 2009 for pain.  He received narcotic pain medicine refills as recently as February 2009.  The reports of the Board of Pharmacy revealed multiple visits to a dentist, Dr. Phyllis Jackson-Williams, through March 2009 where he received narcotic pain medicine.  Morgan was very upset with the ER doctor and would not believe that he would not refill his pain medication.  He was discharged in stable condition.  R. 312, 363-65 and 558-59.  A lumbar series showed no acute traumatic injury, mild spondylosis, and no change from previous examination.  R. 366, 545-46, 556-57 and 821-23.[12]

On April 8, 2010, Dr. Bourgeois refilled the prescription for Hydrocodone.  R. 290.

On April 15, 2010, Morgan returned to the EJGH ER with back pain.[13]  The record indicates that this was at 6:41 a.m.  The ER doctor counseled him that an emergency room was not the appropriate place to be treated for chronic pain.  Morgan disparaged the doctor and suggested that the doctor should fall and experience Morgan's pain.  The doctor gave him an injection of Dilaudid and Toradol.  Morgan left the ER without being discharged and before the doctor could give him a prescription for pain medication.  R. 367-69 and 761-63.  On that same date, Morgan returned to the ER near midnight.  Vicodin and Norflex were prescribed.  R. 381-82 and 791-92.

On April 19, 2010, Morgan was seen by Dr. Bourgeois.  He continued to have severe low back pain.  It was only relieved with medication.  The pain was worse than it was three months before.  Dr. Bourgeois noted that Morgan should have a new lumbar MRI.  R. 290 and 513.

---

[12]  The records for this ER visit to EJGH are R. 807-36.
[13]  The records for this ER visit to EJGH are R. 754-06.

On April 20, 2010, Dr. Bourgeois faxed a request to the pharmacy to refill a prescription for Hydrocodone.  R. 513.

On April 22, 2010, Dr. Kramer completed a psychiatric evaluation at JPHSA Clinic.  R. 256-68.  Morgan reported that he fell in 2009 and damaged discs in his back.  He was going to have epidural injections.  If they did not help, he would have surgery.  On January 19, 2010, his left rotator cuff was repaired.  He was taking Loritab.  R. 257.  He had a history of drug and alcohol abuse.  R. 258.  Fluoxetine and Buspirone were prescribed.  He was instructed to abstain from alcohol and addicting substances.  He was to follow-up with East Jefferson Adult DayCare Center for continuity of care.  R. 251.

On April 23, 2010, Morgan canceled his appointment with a JPHSA Clinic orientation group on April 28, 2010.  R. 252.

On April 26, 2010, Morgan was seen by Dr. Bourgeois.  He had received an epidural from Dr. Martinez but it was not helping.  The shoulder pain was intermittent.  He was to return after an MRI.  R. 512 and 524.  Dr. Bourgeois reported that Morgan was unable to return to work because of his physical condition.  R. 296.

Dr. Martinez referred Morgan to Dr. Justin Lundren for a nerve conduction study.  R. 687.  The findings of an April 28, 2010 nerve conduction study were abnormal.  There was dysfunction in both lower extremities suggestive of sensorimotor polyneuropathy.  R.  319-21, 328-330, 645-47 and 1508-11.

On May 3, 2010, Morgan reported to Dr. Martinez that he was not better after an epidural injection.  R. 275.  After an MRI, Dr. Martinez would consider a second epidural.  R. 275. On May 3, 2010, Dr. Bourgeois called in a refill of pain medication.  R. 292 and 511.

On May 4, 2010, Morgan did not show for an orientation group at JPHSA Clinic.  R. 252.

On May 7, 2010, there was an MRI of Morgan's lumbar spine.  The impression was mild midline or central disc protrusion at the L4-L5 level resulting in only mild thecal sac compression at this level.  No detrimental change was noted and it was stable when compared to the last exam of December 29, 2009.  R. 281-82, 309-10, 644 and 1507.

Morgan received some physical therapy for his left shoulder and low back pain.  The discharge report for the PT is dated May 10, 2010.  R. 551-553

On May 13, 2010, Morgan was seen by Dr. Bourgeois.  He reported low back pain.  There was no change from a previous MRI.  There was no surgical disc problem.  The symptoms were not explained by the MRI.  There was no change from the prior MRI.  His problem may not be related to the work injury.  He was to return after an EMG and neurology evaluation.  R. 511 and 523.

Dr. Bourgeois reported that Morgan was unable to return to work because of his physical condition.  R. 295.

On May 17, 2010, Morgan was a no-show for the group at JPHSA Clinic.  R. 252.

On May 18, 2010, Dr. Martinez gave Morgan a right epidural steroid injection.  R. 273, 670, 679, 1547, 1549 and 1557-58.  A urine screen was positive for marijuana. An opiate consent form and contract was signed.  Morgan stated that he understood the restrictions.  R. 274, 671 and 680.

On June 2, 2010, Morgan was seen by Dr. Martinez.  He reported pain in his right back radiating into the right thigh.  The positive effect of an epidural did not last.  There was a slightly decreased sensation in the right thigh but otherwise the exam was unremarkable in the lower extremities.  He was positive for marijuana on this visit and the prior visit.  He reported taking Hydrocodone but running out a few days before the appointment.  He was referred to Najeeb

Thomas, M.D., for a surgical consultation.  Embeda was prescribed.  He was told not to use marijuana.  R. 272, 669 and 677-78, 1546, 1548, 1555-56.

On June 2, 2010, Dr. Bourgeois phoned in a prescription for pain medication.  R. 293 and 510.

On June 11, 2010, it was noted that Morgan had not attended the JPHSA Clinic group sessions.  The Clinic was unable to contact him.  No further appointments were set.  His file was closed with the note that further treatment was needed, but it was rejected by Morgan.  R. 252.

On June 14, 2010, Morgan sought treatment at the JPHSA Clinic.  He explained that his prescription was nearly out.  Without the medication, he would go off the deep end.  The last time he was without medication, he reported that he attempted to suicide.  He was scheduled for an appointment on July 9, 2010.  R. 252.

On June 15, 2010, Dr. Bourgeois phoned in a prescription for pain medication.  R. 293 and 510.  He reported that Morgan was physically unable to work.  Celebrex taken every day helped.  Steroid injections could help.  R. 306.

On July 9, 2010, Morgan reported to JPHSA Clinic that Prozac and BuSpar worked best.  He needed his medication.  Although he had a history of substance abuse, he was not interested in treatment.  R. 252.  The medication was prescribed by the JPHSA Clinic.  R. 254.

On July 13, 2010, Morgan was seen by Dr. Martinez.  He reported pain of nine on a ten point scale.  Dr. Martinez recommended opiate pain management with Embeda.  A prior urine screen was positive for marijuana.  At that time Morgan was violating the opiate contract.  He had obtained 120 Vicodin tablets from Dr. Bourgeois.  On July 13, he refused the urine screen.  He admitted taking marijuana and Xanax.  It was not prescribed.  He obtained it illegally.  Dr. Martinez noted that conservative treatment had failed and it was likely that surgery was needed.

Because of the substance abuse, he was not recommended for further opiate management.  R. 270-71, 547-48, 685-86 and 1563-64.

On July 15, 2010, Dr. Bourgeois reported that Morgan was physically unable to return to work.  He had no further treatment recommendations.  The shoulder was at maximum medical improvement.  He was seeing a neurosurgeon for his back condition.  R. 294, 510 and 522.

On August 5, 2010, Morgan was seen by Najeeb M. Thomas, M.D. complaining of low back pain and shooting pain down the thigh, buttock, and down the side of his right leg.  Dr. Thomas recommended a discectomy and told him he had to stop smoking two weeks before the surgery and six weeks after it.  R. 317-18, 326-27, 1491-92 and 1577-78.  Dr. Thomas provided a three page letter to Morgan to describe a surgical procedure – a right L2-3 minimally invasive far lateral discectomy.  R. 314-16, 323-25, 632-36, 641-42, 1488-90 and 1574-76.

On August 9, 2010, he reported that he was scheduled for back surgery.  He wanted to continue on his medication for depression and anxiety.  Prozac and BuSpar were prescribed by the JPHSA Clinic.  R. 255.

On August 20, 2010, Morgan failed to appear at JPHSA Clinic as scheduled.  R. 1631.

On September 7, 2010, Dr. Thomas operated on Morgan at EJGH as an outpatient for a minimal invasive extraforaminal discectomy through a far lateral approach with use of a microscope and microscopic technique.  A small piece of disc was removed.  There was nothing further that could be compressing the nerve root.  R. 372-75, 624-35, 648-52, 976-77 and 1512-13.  Morgan was given home medications (Prozac, BuSpar, Lyrica, Percocet, and Flexeril) by EJGH.  R. 370-71.[14]

---

[14]  The records of this ER visit to EJGH are R. 924-1029.

On September 12, 2010, Morgan returned to the ER at EJGH with complaints of back pain.  He was given Dilaudid and Phenergan.  R. 383-84 and 1182-83.[15]

On September 23, 2010, Morgan was seen by Dr. Martinez for follow-up after the surgery on September 7, 2010.  He continued to call for refills of Norco.  He went through 60 Norco pills in three days.  His urine was positive for Norco, benzodiazepine and THC.  Percocet was prescribed (one every four hours).  Morgan reported that he had relief in his leg for about three to four days after the surgery, but the burning in his right thigh came back.  He also reported low back pain.  R. 627-28, 637-38, 1487, 1497-98 and 1572.

The physical exam on September 23 showed Morgan was ambulatory.  His gait was normal.  There was no limitation on range of motion of his lumbar spine.  The incision was clean with no evidence of infection.  He had normal strength and sensation in both of his lower extremities.  His motor strength was 5/5 throughout.  R. 627.  On September 23, he signed a medication contract with Dr. Martinez's office concerning a prescription for Norco which is potentially addictive.  R. 695 and 1579.

On October 11, 2010, Morgan returned to the EJGH ER with back pain.  He was given Percocet and Flexerill and discharged in stable condition. He was given a prescription for this medication.  R. 549-50 and 1155-56.[16]  Six films of the lumbar spine were obtained for a comparison study with April 5, 2010.  There was anatomic alignment of the lumbar vertebral bodies; stable loss of interbody disc space at L5-S1; and stable spurring at L1-4 levels; mild arthropathy at L5-S1.  There was preservation of the remaining interbody disc heights and vertebral body heights.  The adjacent soft tissues were unremarkable.  There was no evidence of fractures, subluxations or spondylosis.  R. 1163.

---

[15] The records of this ER visit to EJGH are R. 1169-97.
[16] The records for this ER visit to EJGH are R. 1140-68.

23

On October 13, 2010, Dr. Martinez referred Morgan to Dr. Roy for pain management and addiction recovery. R. 617 and 1616-17. There are no records of Morgan seeing Dr. Roy.

On October 14 and 15, 2010, Dr. Martinez refused to refill a Hydrocodone prescription for Morgan. R. 618-21 and 1595-97.

On October 15, 2010, Morgan went to the ER at EJGH with complaints of persistent low back pain. He reported that he was out of pain medicine. He was told by his attorney to come to the ER for further treatment. He was to follow-up with pain management. R. 1127.[17]

On October 17, 2010, Morgan returned to the ER at EJGH complaining of left molar pain. He reported a recurrent problem with the tooth. There were nine previous visits to the ER during the year for back pain. He was to see a dentist. Vicodin and Amoxicillin were prescribed. R. 1102.[18]

On October 23, 2010, Morgan returned to the ER at EJGH with reports of back pain. He was out of pain medication. His lawyer told him to come to the ER. This was his fourth ER visit in 11 days. He was given Demerol and Phenergan. No prescription medication was given. Morgan stated he would come back the next day for more pain medication. R. 1072-73.[19]

On October 25, 2010, Morgan returned to JPHSA Clinic. He reported increased depression. His medication was changed. He had not done his blood work but promised to do it the next day. R. 1632.

On November 1, 2010, Morgan was seen by Dr. Bourgeois. He reported that left shoulder pain recurred about two months earlier. The treatment plan referred to light duty as relates to Morgan's left shoulder. He needed a follow-up MRI. R. 521.

---

[17]  The records for this ER visit to EJGH are R. 1114-33 and 1136-39.
[18]  The records for this ER visit to EJGH are R. 1090-1113.
[19]  The records for this ER visit to EJGH are R. 1058-89.

On November 4, 2010, Morgan was seen by Dr. Thomas with a complaint of pain in his right leg and low back below the level of the surgery.  Dr. Thomas explained that he would not give him any medication.  He had to see Dr. Martinez for medication.  Dr. Thomas did not believe he could work.  R. 605, 623, 628-29, 1486 and 1495-96.

On November 12, 2010, there was an MRI of the left shoulder.  The impression was a small rim-rent tear at the distal aspect of the supraspinatus tendon.  R. 541-42.

On November 18, 2010, Morgan was referred by Dr. Thomas for physical therapy, evaluation and treatment.  R. 601-03 and 1610.

On November 18, 2010, Morgan was seen by Dr. Bourgeois.  Morgan complained of pain on overhead motion and he could not lie on his side.  Although the radiologist saw a small rim-rent tear of the left shoulder's supraspinatus tendon, Dr. Bourgeois did not see it.  He wanted an MRI arthrogram of the left shoulder with Morgan to return after the MRI.  Dr. Bourgeois noted that Dr. Thomas had referred Morgan to Dr. Roy for pain management.  R. 507 and 520.

On December 1, 2010, Morgan canceled an appointment at JPHSA Clinic.  R. 1633.

On December 3 and 6, 2010, Morgan called CVS for refills for Hydrocodone.  Dr. Bourgeois refused to refill the prescriptions until December 17, 2010.  R. 508.  On December 6, 2010, Morgan failed to appear for an appointment at JPHSA Clinic.  R. 1633.

On December 5, 2010, Morgan returned to the ER at EJGH with back pain.  He was out of medication.  He wanted a refill.  He was given a prescription for 12 Narco pills.  R. 1045-46.[20]

On December 17, 2010, Dr. Bourgeois called in the refill to the pharmacy for Morgan.  R. 507.  On December 27, 2010, Morgan called Dr. Bourgeois and reported that he had a Christmas party the weekend before and someone stole his prescription.  Dr. Bourgeois refused to refill his prescription.  R. 507.

---

[20]  The records for this ER visit to EJGH are R. 1033-57.

25

**2011**

On January 14, 2011, there was MRI of the left shoulder.  R. 538-40.  On January 24, 2011, Morgan was seen by Dr. Bourgeois, who described the MRI as negative for a tear of the rotator cuff.  X-rays showed mild arthritis.  Morgan would be ready for a functional capacity evaluation when he was cleared by his spine surgeon.  R. 507 and 519.  On January 29, 2011, he called for a refill on Norco.  Dr. Bourgeois told him it was too soon.  R. 508.

On February 3, 2011, Morgan was seen at JPHSA Clinic and reported that he was without his medication for a week.  He felt awful.  He was depressed and agitated.  He did not complete the blood work.  R. 1633-34.

On February 28, 2011, Morgan returned to JPHSA Clinic.  He reported problems with the medication-Abilify.  R. 1635.

On March 18, 2011, Morgan returned to JPHSA Clinic.  He felt he was okay when he was on his medication.  He feared he was having panic attacks.  R. 1635.

On May 13, 2011, Morgan returned to JPHSA Clinic.  He asked if he could change his medication.  The medication he wanted was a controlled substance.  R. 1637.

On June 21, 2011, Morgan reported to JPHSA Clinic that he was out of his medication.  His medication was adjusted to stabilize his mood.  R. 1637.

On June 28, 2011, Morgan was seen by Dr. Thomas.  He reported that he did well for a few months after his surgery.  He complained about pain in his buttock shooting down into his right leg.  His reflexes were normal.  The straight leg test was positive.  The working diagnosis was recurrent disc herniation and some nerve damage potentially from his injury.  Lyrica was prescribed.  Dr. Thomas suggested he may need a new MRI.  R. 1484, 1493-94 and 1589.

26

On June 29, 2011, Dr. Thomas refused to refill a prescription for Cyclobenzaprine.  R. 1580.

On July 15, 2011, Morgan reported to JPHSA Clinic that he liked his medication.  He was less distressed.  R. 1638.

On July 20, 2011, there was an MRI for lumbar spine.  It was done at the request of Dr. Thomas.  R. 1504-06.

On July 28, 2011, it was noted that Morgan had called twice for pain medication.  Dr. Thomas' office responded that he would not be filling any pain medication prescriptions for him. R. 1485.

On October 6, 2011, Morgan was seen by Dr. Martinez.  He scheduled a L3 transforaminal injection.  R. 1478.

On October 19, 2011, Morgan returned to JPHSA Clinic and reported severe orthopedic problems with his back.  He watched TV most days.  He lived with his mother-in-law.  He was not on any medication other than what was prescribed at JPHSA Clinic.  R. 1638.

On October 20, 2011, Morgan was seen by Dr. Thomas.  His strength and reflexes were normal.  He noted that Dr. Martinez felt that Morgan had a large opiate component related to his pain.  Dr. Thomas wanted a new MRI and x-rays.  R. 1472.

On October 31, 2011, Morgan returned to JPHSA Clinic.  He reported that all he did was sleep and stay in bed all day.  He needed a get up-and-go medication like Adderall.  R. 1638.

On November 2, 2011, Morgan called JPHSA Clinic and reported that he needed medication.  His chart indicated that he should have refills left.  R. 1639.

On November 15, 2011, there was an MRI of the lumbar spine.  There was no change in its appearance since July 20, 2011.  There were small to moderate-sized circumferential disc

bulges and mild to moderate facet arthropathy along the lumbar spine with small disc herniation at L2-L3 and shallow herniation at L4-L5 with no central canal narrowing.  There was no significant spinal canal narrowing on the remaining levels.  There could be some slight impingement at L2 right nerve root.  R. 1661-62.

On November 28, 2011, Morgan called JPHSA Clinic about medication issues.  He was scheduled to come in on November 29, 2011.  He called to cancel the appointment.  No reason was given.  He said he would call back on November 30, 2011.  R. 1639.

**2012**

On January 10, 2012, JHSA Clinic established a treatment plan for Morgan.  For example, Morgan was to have random drug screens to check for possible interactions between medicine and other mood altering chemicals.  R. 1663.

On May 9, 2012, Morgan was seen by Brett Rothaermel, M.D. with the East Jefferson Occupational Medicine Clinic for a consultative examination.  He reported a history of chronic low back pain.  There was burning pain in his legs.  It became worse with prolonged walking and standing.  It was relieved by lying down.  He was taking Latuda, Aleve, Fluoxetine, BuSpar and Tylenol.  His height was 65.5 inches.  His weight was 243 pounds.  He ambulated without difficulty and without an assistive device.  He was comfortable throughout the exam.  He got on and off the exam table with ease.  His complaints of low back pain were substantiated by MRI findings.  The findings were not worrisome and should not interfere with the performance of work related activities.  There was no lower extremity sensory or reflex loss.  There was no lower extremity atrophy.  The straight leg test was negative for radicular complaints.  He should be able to perform work related activities with less physical demands.  There were no objective

findings on physical exam that would limit Morgan from performing normal work activities as a result of his shoulder complaints.  R. 1668-79.

e.      **Plaintiff's Appeal.**

**Issue No. 1**.      At step two, did the ALJ err in finding that Morgan's shoulder impairments were not severe within the meaning of the Act?

Morgan demonstrates that the ALJ erroneously concluded that he did not receive treatment for his shoulder after July 2010.  R. 16.  Morgan complained of shoulder pain on November 1, 2010.  R. 521.  There was an MRI of the left shoulder on November 12, 2010.  R. 541-42.  On November 18, 2010, he complained of left shoulder pain on overhead motion.  R. 520.  On January 24, 2011, he reported left shoulder pain.  R. 519.  Morgan contends that:  (1) the ALJ's finding that his shoulder impairment was not severe within the meaning of the Act was based on the erroneous conclusion; and (2) the failure to find that the shoulder impairment was a severe impairment invalidates the ALJ's hypotheticals because they do not contain any limitation attributable to the shoulder.

The Commissioner acknowledges the ALJ's error, but contends that:  (1) Morgan fails to demonstrate how this turns the shoulder impairment into a severe impairment; (2) he does not allege any work-related limitations associated with his shoulder; and (3) he misinterprets the January 24, 2014 report by Dr. Bourgeois to the workers' compensation adjuster.

Morgan first went to Dr. Bourgeois, an orthopedist, on September 21, 2009.  R. 283.  On October 19, 2009, he diagnosed cuff tendonitis in the left shoulder.  R. 284.  On December 7, 2009, he recorded that Morgan needed an arthroscopy.  R. 285.  On January 19, 2010, he performed an arthroscopic decompression, joint resection and debridement of the degenerative labral and rotator cuff tears of the left shoulder.  R. 562-63.  On November 12, 2010, there was

an MRI of the left shoulder.  The impression was small rim-rent tear at the distal aspect of the supraspinatus tendon.  R. 541-42.

On January 14, 2011, there was a further MRI Post Arthrogram at the request of Dr. Bourgeois.  The findings included the statement that there was no extension of contrast deep to the labrum to suggest a labral tear.  R. 538-39.  Morgan does not refer to this MRI in his argument.

On January 24, 2011, Morgan was seen by Dr. Bourgeois.  There are notes of the visit (R. 507) as well as the report to Summit Claims (R. 519).  Dr. Bourgeois described the January 14 MRI Post Arthrogram as negative for a tear or other surgical lesion.  There was mild arthritis. Although Dr. Bourgeois' January 24, 2011 report to Summit Claims indicates that Morgan was unable to return to work, he would be ready for a functional capacity evaluation when he was cleared by his spine surgeon.  Morgan was to return to Dr. Bourgeois in three months.  R. 519. The Commissioner argues that this demonstrates that Dr. Bourgeois believed that Morgan's return to work was only delayed by his spinal surgery on September 7, 2010.

There are no notes of treatment by Dr. Bourgeois after January 24, 2011.  Morgan did not return in three months.  After January 24, 2011, Morgan received treatment at JPHSA Clinic and from Drs. Martinez and Thomas for his complaints of back pain.  He did not receive further treatment for his shoulder.  Dr. Rothaermel found no objective findings on the physical exam that would limit Morgan from performing normal work activities as a result of his complaints of pain in his shoulder.  R. 1672.

Notwithstanding the ALJ's erroneous statement that Morgan did not receive treatment for the shoulder impairment after July 2010, there is substantial evidence to support the ALJ's finding that Morgan's shoulder impairment was not a severe impairment.

**Issue No. 2**.     Did the ALJ err in making a credibility assessment?

Morgan disputes the ALJ's credibility assessment.  First, he contends that the ALJ's reasons for not accepting his allegations of disabling pain are not rationally related to the evidence.  Second, the ALJ unfairly concluded that there was no evidence of follow-up with a January 10, 2012 plan of treatment for his mental disorder.  Third, the ALJ erroneously indicated that he declined surgery for his back.  Fourth, the ALJ employed a boilerplate statement in his opinion which was criticized in <u>Bjornson v. Astrue</u>, 671 F.3d 640, 645 (7th Cir. 2012).

The Commissioner responds that:  (1) the objective medical evidence repeatedly revealed essentially benign physical examinations; (2) there was no evidence of muscle atrophy, wasting or weakness; (3) the record demonstrates Morgan's drug seeking behavior; and (4) Morgan reported that with pain medication his pain was significantly decreased.  The Commissioner correctly observes that without Morgan's persistent complaints of pain, the doctors would not prescribe the pain medication which Morgan repeatedly sought.  For example, he went to the ER at EJGH four times in eleven days in October 2010 complaining of pain and seeking medication.  R. 1072-73.

Morgan argues that the ALJ erroneously indicated that Morgan declined surgery for his back.  In response, the Commissioner contends that:  (1) the ALJ was confused regarding Morgan's desire for a new pain management doctor; and (2) the ALJ recognized that Morgan went forward with the back surgery on September 7, 2010.

Morgan began seeing Dr. Bourgeois on September 21, 2009.  R. 283.  At this time Morgan also went to IWC, where he saw Drs. Greenberg and Kurpel, who prescribed pain medication.  R. 477-79.  Morgan's last visit to IWC was on January 8, 2010.  He was to return six weeks after his shoulder surgery, but he did not do so.  R. 468-70.

31

On January 19, 2010, Dr. Bourgeois performed surgery to repair the right rotator cuff.  R. 562-63.  On February 25, 2010, Dr. Bourgeois referred Morgan to pain management.  On March 15, 2010, Morgan began seeing Dr. Martinez at Parish Pain Specialists on the referral from Dr. Bourgeois.  Dr. Martinez recommended an epidural injection.  R. 278-79.  In April (R. 276-77) and May (R. 273), Morgan received epidural injections from Dr. Martinez.  Because the positive effects of the epidural injections did not last, on June 2, 2010, Dr. Martinez referred Morgan to Dr. Najeeb Thomas for a surgical consultation.  R. 272.

On July 13, 2010, Morgan returned to Dr. Martinez, who recorded that Morgan likely would need surgical correction for the lumbar pain.  Dr. Martinez noted that he had referred him for a surgical consultation, but he preferred a different physician.  Dr. Martinez offered to help him find one, but Morgan said that he would prefer that his attorney do this.  R. 270. Nevertheless, on August 5, 2010, Morgan went to Dr. Thomas, the physician recommended by Dr. Martinez.  R. 317-18.  Dr. Thomas performed the outpatient back surgery procedure on September 7, 2010.  R. 372-75.  After the surgery, Morgan returned to Dr. Martinez.  R. 627-28.

The ALJ stated:

> Although the claimant was recommended for surgical intervention after his physical therapy and steroid injections failed, the claimant was not interested in undergoing surgery and after being referred for surgery, the claimant requested a different physician, seemingly because he was not experiencing severe pain or wanted to avoid undergoing the recommended surgery.

R. 23.  The ALJ did note that Morgan underwent surgery with Dr. Thomas on September 7, 2010.  R. 20.  While there is some confusion in the ALJ's statement, it does not demonstrate the large impact on the ALJ's credibility finding cited by the Morgan.  Rec. doc. 15 (Memorandum at 6).  There is substantial evidence to support the ALJ's determination on credibility with the

absence of evidence of muscle atrophy, wasting or weakness and Morgan's drug seeking behavior.

Morgan objects to the ALJ's inclusion of a boilerplate statement that was found impermissible in the Seventh Circuit's decision - Bjornson v. Astrue.  In Falco v. Shalala, 27 F.3d 160 (5th Cir. 1994), the Fifth Circuit stated:

> The ALJ further indicated that he found the claimant's subjective complaints exaggerated and not credible.  The ALJ found that the medical evidence more persuasive than the claimant's own testimony.  These are precisely the kinds of determinations that the ALJ is best positioned to make.

Id. at 164.  Notwithstanding the inclusion of the boilerplate statement, the ALJ's decision and findings on credibility are consistent with the procedure and analysis described in Falco.

On January 10, 2012, JHSA Clinic established a treatment plan for Morgan.  R. 1663. The ALJ noted that there is no record of additional treatment despite the severe depression described by Morgan.  R. 23.  The hearing with ALJ Palacios was on January 5, 2012.  R. 33.  At the hearing, the ALJ referred to Morgan's workers' compensation case.  Morgan's counsel did not say when the case was settled, but he did state, "it just settled recently."  R. 38. Other than the January 10, 2012 JHSA Clinic treatment plan and the report of Dr. Rothaermel's consultative examination on May 22, 2012, there are no other post-hearing records of medical treatment for Morgan.  He contends that the ALJ unfairly concluded that Morgan did not follow-up with the treatment plan.  If there were medical records of further treatment at JHSA Clinic or elsewhere, Morgan was not prevented from presenting them prior to the ALJ's decision on November 8, 2012 or to the Appeals Council.  The Commissioner did not make an unfair conclusion.

There was no error in the ALJ's credibility assessment.

**Issue No. 3**.    Did the ALJ err in considering the evidence of the treating physician?

The ALJ gave minimal weight to Dr. Thomas' November 4, 2010 statement that Morgan could not work because of severe back pain because: (1) Morgan's drug seeking behavior undermined his credibility on the extent of his pain; (2) Dr. Thomas' failed to acknowledge this behavior; (3) there were minimal objective findings; and (4) Dr. Rothaermel found he could work. The ALJ also cited Morgan's lack of interest in undergoing surgery after being referred for surgery. R. 23. The "lack of interest in surgery" is discussed in Issue No. 2.

Morgan contends that the ALJ erred because: (1) the conclusion that drug seeking behavior is inconsistent with the existence of pain is unsubstantiated; (2) he failed to consider the criteria in 20 C.F.R. 404.1527 and discussed in Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000); (3) he failed to give Dr. Thomas' opinion the deference required under SSR 96-2p (1996 WL 362211); and (4) he failed to contact Dr. Thomas to determine the reason for any perceived inconsistencies between his conclusions and the evidence of record as required by SSR 96-2p.

Morgan's first visit to Dr. Thomas was on August 5, 2010. R. 317-18. In the year following the accident on June 25, 2009, Morgan received treatment from North Oaks Medical Center, Drs. Greenberg and Kurpel at IWC, the ER at EJGH for complaints of pain, EJGH for depression, JPHSA Clinic for psychological and psychiatric treatment, Dr. Bourgeois for his shoulder, Dr. Martinez for pain management, and Dr. Lundren for a nerve conduction study. Because the positive effects of the epidural injections did not last, Dr. Martinez referred Morgan to Dr. Thomas for a surgical consultation.

On September 7, 2010, Dr. Thomas performed outpatient surgery on Morgan. The procedure was a minimal invasive extraforaminal discectomy at L2-L3. A small piece of disc was removed. There was nothing further found that could be compressing the nerve root. R.

374-75.  On September 23, 2010, Morgan reported temporary relief from pain in his leg.  R. 627.

The nurse practitioner in Dr. Thomas' office noted:

> On exam Mr. Morgan is ambulatory.  His gait is normal.  He has no limitation on
> range of motion of his lumbar spine. . . .  He has normal strength and sensation to
> both of his lower extremities.  His motor strength is 5/5 throughout.

R. 627.  On October 11, 2010 there were x-rays of the lumbar spine.  There was stable spurring

at L1-L4.  There was mild left facet arthropathy at L5-S1.  No acute osseous abnormality was

observed.  There were stable degenerative changes at L5-S1.  R. 1163.

On November 4, 2010, Morgan was seen by Dr. Thomas, who noted:

> I do believe that we can start him on some physical therapy and see him back in a
> few months.  At that time we can assess how he is doing and determine if he is at
> maximum medical improvement.  Right now I do not believe that he can work
> because he is in so much pain, but hopefully things will cool down and I will see
> him back in three months and start him on some therapy.  At that time we will
> address his work restrictions.

R. 605.  Dr. Thomas referred Morgan to physical therapy.  R. 601.

Morgan did not return to Dr. Thomas in three months.  The next visit was on June 28,

2011 or about eight months later.  R. 1484.  Between November 4, 2010 and June 28, 2011, there

were several incidents where Morgan sought prescription drugs, but his physicians refused to

refill the prescription.  On December 3 and 6, Morgan sought refills of Hydrocodone, but Dr.

Bourgeois refused to refill the prescriptions.  R. 508.  On December 5, 2010, he went to the ER

at EJGH with complaints of back pain, where he was given 12 Narco pills.  R. 1045-46.  On

December 17, Bourgeois called in a refill.  R. 507.  On December 27, Morgan asked Dr.

Bourgeois to refill his prescription with the story that someone stole his prescription at a party at

his home.  Dr. Bourgeois refused to refill the prescription.  R. 507.  On January 29, 2011,

Morgan sought a refill on Norco, but Dr. Bourgeois refused.  R. 508.  After a lapse of several

months, Morgan told JPHSA Clinic in May that he needed a prescription for Adderall, a controlled substance.  R. 1637.

On June 28, 2011, Morgan went to Dr. Thomas.  He complained of pain shooting down his right leg.  Dr. Thomas found some mild percussive tenderness to his low back, his reflexes were normal, he had a positive straight test, and he was hyperpathetic to his right thigh.  Dr. Thomas' working diagnosis was a recurrent disc herniation and he had some nerve damage from his injury.  He wanted an MRI.  R. 1484.  The next day, June 29, Morgan went to a pharmacy.  He had it fax a request to Dr. Thomas for Cyclobenzaprine.  Dr. Thomas denied the prescription.  R. 1580.  On July 20, 2011, there was an MRI of the lumbar spine.  R. 1504-06.  On July 28, 2011, it was noted by Dr. Thomas' office that Morgan called twice for pain medication.  Dr. Thomas refused to fill the prescriptions.  R. 1485.

On October 20, 2011, Morgan returned to Dr. Thomas with complaints of pain shooting into his right leg.  His strength and reflexes were normal.  Dr. Thomas requested a new MRI.  If there was no compression, he would need chronic pain management and permanent restrictions.  If there was new compression or instability, it would be addressed.  Morgan was to return after the MRI.  R. 1472.

On November 15, 2011, there was an MRI of the lumbar spine.  There was no change in its appearance since July 20, 2011.  There were small to moderate-sized circumferential disc bulges and mild to moderate facet arthropathy along the lumbar spine with small disc herniation at L2-L3 and shallow herniation at L4-L5 with no central canal narrowing.  There was no significant spinal canal narrowing on the remaining levels.  There could be some slight impingement at L2 right nerve root.  R. 1661-62.

Morgan did not return to Dr. Thomas after the MRI.  Morgan's last visit to Dr. Thomas was on October 20, 2010.  There was no assessment by Dr. Thomas of the November 15, 2011 MRI.  On May 9, 2012, Morgan was seen by Dr. Rothaermel.

    a.  <u>Morgan's drug seeking behavior</u>.

There is ample evidence of Morgan's drug seeking behavior, including during the time that he received treatment from Dr. Thomas.  As noted in the discussion of Issue No. 2, the doctors would not prescribe the pain medication without Morgan's persistent complaints of pain which he presented to every one of his providers.  The medical evidence substantiates the ALJ's conclusion that Morgan's drug seeking behavior was inconsistent with the existence of pain.  More importantly is the lack of objective medical evidence supporting the claim of disabling pain.  The November 15, 2011 MRI did not reflect any change from the July 20, 2011 MRI.  R. 1661-62.  Although Morgan did not return to Dr. Thomas after the November 15 MRI, he did see him after the July 20 MRI.  Dr. Thomas did not conclude that surgery was warranted based on that MRI.

While Dr. Rothaermel found that Morgan's complaints of low back pain were substantiated by the MRIs, he did not consider them worrisome or that they would interfere with the performance of work-related activities.  Dr. Rothaermel's examination found no lower extremity sensory or reflex loss.  There was no lower extremity atrophy.  The straight leg test was negative for radicular complaints.  R. 1668-79.

    b.  <u>The criteria in 20 C.F.R. 404.1527 and compliance with SSR 96-2p</u>.

The ALJ assigned minimal weight to the statement of November 4, 2010 by Dr. Thomas, Morgan's treating specialist for the neurosurgery on his back, and great weight to the opinion of

Dr. Rothaermel, whose practice is occupational medicine and who completed a consultative examination of Morgan on May 9, 2012.

In <u>Newton v. Apfel</u>, 209 F.3d 448 (5th Cir. 2000), the Fifth Circuit stated:

> The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  A treating physician's opinion on the nature and severity of a patient's impairment will be given <u>controlling weight</u> if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  The opinion of a specialist generally is accorded greater weight than that of a non-specialist.

> Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  The treating physician's opinions are not conclusive.  The opinions may be assigned little or no weight when good cause is shown.  Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

<u>Newton</u>, 209 F.3d at 455-56 (Citations, quotation marks and brackets omitted, and emphasis added).  Social Security Ruling 96-2p, 1996 WL 362211 (61 FR 34490), provides direction on when treating source medical opinions are entitled to controlling weight.

> If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.

<u>Id</u>. at *34490.

The criteria in 20 C.F.R. § 404.1527 are:

(1) the physician's length of treatment of the claimant,

(2) the physician's frequency of examination,

(3) the nature and extent of the treatment relationship,

(4) the support of the physician's opinion afforded by the medical evidence

of record,

(5) the consistency of the opinion with the record as a whole; and

(6) the specialization of the treating physician.

Id. and Newton, 209 F.3d at 456.  As regards these factors, the Fifth Circuit stated:

> The Court concludes that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).

209 F.3d at 453.

This first issue is whether Dr. Thomas' November 4 statement is well-supported.  Dr. Thomas' note of the November 4 visit recorded that he believed that Morgan could be started on physical therapy and he referred him to it.  R. 601 and 605.  R. 601.  The note of the visit states he would see Morgan back in a few months, assess how he was doing, and determine if he was at maximum medical improvement.  R. 605.  Thomas did not return in a few months.  He did not return until eight months later.  R. 1484.  During that interval, Thomas exhibited drug seeking behavior.  See for example R. 507.

As of November 4 Dr. Thomas had not determined whether Dr. Morgan was at maximum medical improvement.  Indeed, Dr. Thomas never made such a determination.  On October 20, 2011, Dr. Thomas requested a new MRI.  R. 1472.  It was done on November 15, 2011.  R. 1661-62.  Morgan did not return to Dr. Thomas after that MRI.

The November 4, note of Morgan's visit to Dr. Thomas states:

> Right now I do not believe that he can work because he is in so much pain, but hopefully things will cool down and I will see him back in three months and start him on some therapy.  At that time we will address his work restrictions.

R. 605.   The statement that Morgan cannot work at the time of the November 4 visit is provisional and depended on how Morgan was in three months.   At that time (approximately early February 2011), Dr. Thomas planned to address Morgan's work restrictions.   This was never done.   In short, Dr. Thomas never determined that Morgan had reached maximum medical improvement and never determined his work restrictions.   Because such determinations are absent from Dr. Thomas' November 4, 2010, the statement is not well-supported.

Assuming it is well-supported, the question is whether it is "not inconsistent with other substantial evidence in the case record. . . ."   SSR 96-2p (61 FR at *34490).   The statement is not consistent with objective findings in the MRIs of July 20, 2011 (R. 1504-06) and November 15, 2011 (R. 1661-62).   For example, the November 2011 MRI found no change from the July 2011 MRI and indicated that there could be some slight impingement at L-2 nerve root.

Dr. Rothaermel reviewed the MRIs, including the November and July 2011 MRIs, and examined Morgan on May 9, 2012.   Dr. Rothaermel found that Morgan could work subject to some restrictions.   R. 1672.   Dr. Thomas' statement of November 4, 2010 regarding Morgan's ability to work is not consistent with Dr. Rothaermel's report of his examination of Morgan and his review of the MRIs, including the November 20, 2011 MRI which Dr. Thomas never saw.

Dr. Thomas' November 4, 2010 statement regarding Morgan's ability to work is not entitled to controlling weight.   "[A]bsent reliable medical evidence from . . . [(an)] examining physician controverting the claimant's treating specialist," analysis of the criteria in 20 C.F.R. § 404.1527 is required if the ALJ rejects the treating physician's opinion.   Newton, 209 F.3d at 453.   There was reliable medical evidence from Dr. Rothaermel controverting Dr. Thomas' November 4, 2010 statement.   The analysis was not required.

The ALJ's decision to accord great weight to Dr. Rothaermel's opinion and minimal weight to Dr. Thomas' statement is consistent with SSR 96-2p, 20 C.F.R. §404.1527, and Newton.

    c.  Was the ALJ required to contact Dr. Thomas?

Morgan contends that the ALL erred in failing to contact Dr. Thomas.  In Newton, the Fifth Circuit stated:

> In this case, the ALJ expressed doubts about Pertusi's opinions based on Willbanks's criticisms and Newton's later part-time work, but did not request additional information to eliminate those doubts before rejecting the opinion of the treating physician.
>
>     Reversal, however, is appropriate only if the applicant shows prejudice from the ALJ's failure to request additional information.   Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision.

209 F.3d at 458 (citations and quotation marks omitted).  SSR 96-2p also indicates additional development may be required.  61 FR at *34991.

Dr. Raymond Pertusi was a rheumatologist, who began treating the Newton claimant in 1989 and continued to see her after she returned to part-time work in 1994.  209 F.3d at 452.  The hearing before the ALJ was in February 1995.  The ruling was issued on September 15, 1995.  Id. at 451.  Otto Willbanks, a medical expert, testified at the February 1995 hearing.  His testimony was based on his review of the medical records.  He had not examined the claimant.  Willbanks noted absences in the record.  For example, he saw no records indicating that the claimant's condition was, at any time, totally non-responsive to medication.  Id. at 454.

The only statement in the ALJ's opinion of such nature is the statement that Dr. Thomas did not acknowledge nor account for Morgan's drug seeking behavior in evaluating the credibility of Morgan's allegations regarding the extent of his pain.  R. 23.  Dr. Rothaermel's

report does not express any criticisms Dr. Thomas' treatment of Morgan.  Dr. Rothaermel does state:

> Dr. Thomas' notes repeatedly indicate frequent patient requests for refills of narcotic pain medication.  A urinalysis was positive for benzodiazepines and THC.  The patient was referred to Dr. Roy, an addiction specialist.  Dr. Thomas stopped prescribing pain medication.

R. 1668.

Assuming Dr. Thomas would reject the ALJ's conclusion and state that Morgan's drug seeking behavior had no effect whatsoever on the degree of credibility to be accorded to Morgan's allegations of disabling pain, Morgan must demonstrate prejudice.  The ALJ would still have before him the opinion of Dr. Rothaermel and the minimal objective findings in the MRIs.  There would be substantial evidence to support the assignment of minimal weight to Dr. Thomas' opinion and great weight to Dr. Rothaermel's opinion.   Morgan cannot demonstrate prejudice.

The ALJ did not err in considering the opinion of Dr. Thomas, one of Morgan's treating physicians.

**Issue No. 4**.    Did the ALJ err in declining to submit Morgan's interrogatories to the vocational expert?

The hearing was on January 5, 2012.  R. 33.  On May 9, 2012, Morgan was seen by Dr. Rothaermel.  R. 1668.  On June 20, 2012, ALJ Palacios notified Morgan's counsel that she had secured the report of Dr. Rothaermel's examination and she proposed to enter it into the record. Counsel was notified that he could submit:  (1) written comments concerning Dr. Rothaermel's report; (2) a written statement of the facts and law applicable to the doctor's report; (3) any additional records to be considered by the ALJ; and (4) questions to be sent to Dr. Rothaermel. Morgan also had the right to request a supplemental hearing.  R. 206.  If the ALJ did not receive

a response within ten days, the ALJ would enter the report in the record and issue a decision.  R. 207.

On July 19, 2012, ALJ Palacios sent Patricia Knight, the vocational expert, the exhibits and interrogatories to be completed based on the evidence provided and her professional knowledge.  R. 209.  After preliminary questions, three hypothetical questions were posed.  R. 210-14.  The vocational expert's response is dated July 25, 2012.  R. 218-22.  With the hypotheticals Morgan could not perform his past relevant work, but the expert identified unskilled jobs that could be performed.  R. 220.

On August 6, 2012, ALJ Palacios notified Morgan's counsel that she had secured the vocational expert's responses to interrogatories and that she proposed to enter them into the record.  The ALJ provided the same opportunities for written submissions and to request a supplemental hearing as were provided for Dr. Rothaermel's report.  R. 223-24.

Morgan's counsel submitted one question for the vocational expert.

Based on your review of the evidence in this matter, do you see any factors that would reduce the occupational base available to Mr. Morgan in general, and specifically, as to the prospective jobs identified in response to the hypotheticals.

R. 225.  On September 6, 2012, ALJ Palacios notified Morgan's counsel that: (1) the question for the vocational expert was not expressed in work-related terms as required of a RFC pursuant to SSR 96-8p; (2) it was improper because it relied on the vocational expert's opinion of the evidence; (3) the vocational expert was not a medical expert so she lacked expertise to render a medical opinion; and (4) the question would not be posed to the vocational expert.

ALJ Palacios renewed the options described in the August 6, 2012 letter including submission of written comments, statement of the facts and law, additional records, and revised

questions for the expert.  Morgan also had the right to request a supplemental hearing where the expert could be examined.  R. 225-26.  Morgan's counsel did not respond.

ALJ Hertzig affirmed ALJ Palacois' rejection of Morgan's question "as the posed question is not a proper question because it erroneously asks the vocational expert to determine the claimant's residual functional capacity based on the vocational expert's assessment of the medical evidence of record."  R. 26.

Morgan contends that :  (1) the question he wanted posed to the vocational expert is often asked of vocational experts; (2) the expert was capable of answering it; (3) the ALJ improperly rejected it; (4) the regulations require that the ALJ allow the claimant to ask witnesses any questions material to the issues (20 C.F.R. § 404.950(e)); (5) the ALJ violated her duty to develop the facts fully and fairly; (6) the matter should be remanded so Morgan can be permitted to question the expert; and (7) his right to procedural due process was violated.

The question was improper.  Morgan did not focus on particular evidence, for example his testimony that he could not lift anything because his shoulder would give out.  R. 54.  The third hypothetical question included an ability to lift and carry up to 20 pounds continuously and lift and carry 21 to 50 pounds occasionally.  R. 220.

Morgan's question is premised on the ALJ's review of the evidence in the record so it necessarily includes all of the medical evidence.  The Commissioner correctly notes that in Houston v. Sullivan, 895 F.2d 1012 (5th Cir. 1989), the Fifth Circuit stated:

> The only evidence suggesting Houston's inability to do medium work is his own testimony and perhaps that of the vocational expert. However, even if the vocational expert's testimony does suggest Houston can do only light work, the court need not have considered her testimony in this issue, because the vocational expert is not a medical expert qualified to testify as to Houston's medical impairments. *See* § 404.1513.

Id. at 1016.

Morgan was not denied procedural due process.  On two occasions following the expert's completion of the interrogatory responses, Morgan was offered the opportunity to request a supplemental hearing where he could question the vocational expert.  R. 223 and 225.  Morgan did not request such a hearing.

**Issue No. 5**.    Did the ALJ err in failing to consider a closed period of disability?

The ALJ did not make a determination regarding any closed period of disability.  The ALJ did find that Morgan was not under a disability within the meaning of the Act from June 25, 2009 through November 8, 2012, the date of the decision.  R. 14 and 26.  The ALJ's description of the issues reflects that disability "is defined as the inability to engage in any substantial gainful activity . . . that . . . can be expected to last for a continuous period of not less than 12 months.  R. 14.

Morgan contends that he was disabled at some point during the period from June 25, 2009 through November 8, 2012.  He argues that Social Security Ruling 82-52 requires that where an ALJ denies a claim on the basis of insufficient duration, the ALJ must address the restoration of function.  Rec doc. 15 (Appendix at 21-25).  He contends that the ALJ erred in not considering a closed period of disability and the evidence supported a finding of a closed period of disability.

The Commissioner responds that: (1) Morgan fails to point to any consecutive 12-month period when he was incapable of substantial gainful activity; (2) he does not state the dates comprising the closed period of disability; (3) he does not identify the medical evidence supporting such a period; and (4) Morgan's argument is so deficient as to be waived due to inadequate briefing.

For the reasons stated by the Commissioner, the ALJ did not err in failing to consider a closed period of disability.

**Issue No. 6**.    Did the ALJ err in the finding of Morgan's residual functional capacity and his ability to obtain and maintain employment.

In <u>Singletary v. Bowen</u>, 798 F.2d 818 (5th Cir. 1986), the claimant sought disability benefits based on his mental condition.  The Fifth Circuit stated:

> A finding that a claimant has a mental impairment which manifests itself from time to time over a long-term period is not inconsistent with the language of the statute, which requires that an impairment last for a continuous period of 12 months.  Of course, . . . a claimant must present medical evidence which indicates that his mental condition is a long-term problem and not just a temporary set-back.

<u>Id</u>. at 822 (citations and quotation marks omitted).  <u>Watson v. Barnhart</u>, 288 F.3d 212 (5th Cir. 2002), applied the <u>Singletary</u> standard to determinations of physical disability.  "The individual's ability to maintain employment should be relevant to a determination of disability regardless of whether the individual suffers from non-exertional limitations."  <u>Id</u>. at 218.  In <u>Frank v. Barnhart</u>, 326 F.3d 618 (5th Cir. 2003), the Fifth Circuit considered the proper scope of <u>Watson</u>.  The claimant in <u>Frank</u> argued that, pursuant to <u>Watson</u>, "the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case."  <u>Id</u>. at 619.  The Fifth Circuit stated:

> *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms.  For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination.

<u>Id</u>. at 619.

Morgan argues that his physical ailments waxed and waned in their manifestation of disabling symptoms   His only example is his testimony that his leg developed a burning,

stabbing situation and gave out about three times a week without warning.  R. 55.  He urges that the ALJ was required to assess his ability to do sustained work-related physical and mental activities in a work setting eight hours a day for five days a week.

Although Morgan stops his analysis of the cases with <u>Frank</u>, the Commissioner carries it a step further with <u>Perez v. Barnhart</u>, 415 F.3d 457 (5th Cir. 2005).

> This court made clear in *Frank* that "nothing in *Watson* suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case."  Rather, " *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms."  Without such a showing, the claimant's ability to maintain employment is subsumed in the RFC determination.  Perez has not made the requisite showing.
>
> The *Frank* court gave an example of evidence that might necessitate a separate finding of a claimant's ability to maintain employment: "For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination."  The evidence urged upon the court by Perez does not rise to this level of impairment.
>
> First, Perez points to his 1995 testimony that he has "good days and bad days."  As the Commissioner correctly points out, Perez's testimony, if credible, "simply do[es] not rise to the level of impairment anticipated by the Court in *Frank*."

<u>Id</u>. at 464-65 (citations omitted).

Morgan cited to his testimony at the hearing before the ALJ where he was asked if he still had pain in his leg, and if so, how often.  He answered, "[o]nce or twice a week I get like a burning pain, burning sensation - - like stabbing sensation."  R. 55.  It lasted about half an hour.  Sometimes when he walked and "I go to step down and my leg gives out on me."  <u>Id</u>.  This occurred about three times a week.  <u>Id</u>.

Morgan's argument is deficient.   First, the ALJ found that Morgan's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to

the extent they were inconsistent with the residual functional capacity described by the ALJ. Second, even if the testimony was credible, the symptoms described by Morgan are more of the type described in <u>Perez</u> than the example in <u>Frank</u>.  Finally and as noted by the Commissioner, Morgan's allegations of his conditions waxing and waning to the degree described by his testimony are contradicted by the objective medical records which demonstrated essentially normal physical examinations with no difficulty walking.  <u>See</u> R. 1280 (7/11/09 no leg weakness or numbness; straight leg raising negative; and mild discomfort in upper thigh); R. 882 (4/5/10 moves all extremities well with full range of motion); R. 627 (9/23/10 he is ambulatory, his gait is normal, and he has normal strength and sensation to both lower extremities); R. 1127 (10/15/10 complains of some tingling in his legs, but no leg weakness, and normal quadriceps strength); and R. 1671 (5/9/12 strength is 5/5 throughout the bilateral lower extremities, normal muscle bulk and tone throughout, and heel and toe walking within normal limits).

The ALJ did not err in failing to analyze whether Morgan could maintain employment eight hours a day, five days a week.  Morgan's ability to maintain employment was subsumed into the RFC determination.

**Issue No. 7**.    Was there substantial evidence supporting the availability of jobs in significant numbers at step five?

The ALJ's interrogatory to the vocational expert asked for the number of jobs that exist in the national economy for each unskilled occupation that the individual could perform.  R. 213. The vocational expert responded that in the U.S. there were 1,077,751 industrial cleaner positions, 222,880 dining room attendant positions, and 74,293 cafeteria attendant positions.  R. 221.  The ALJ cited these responses.  R. 26.

20 C.F.R. § 404.1566(a) states, "[w]e consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other

regions of the country."   Morgan acknowledges that the Fifth Circuit has never established bright-line guidance as to what constitutes significant numbers.   In Lirley v. Barnhart, 124 Fed. Appx. 283 (5th Cir. 2005), the claimant argued that the Commissioner failed to meet her burden of proof under Section 404.1566 when the vocational expert testified that claimant could perform the job of surveillance system monitor and 50,000 such jobs existed in the national economy. The Fifth Circuit rejected the claimant's argument.  Id.

Morgan contends that the ALJ should have considered the following factors described in Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988), Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988), and Trimiar v. Sullivan, 966 F.2d 1326, 1330 (10th Cir. 1992):  the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; and the types and availability of such work.   The Commissioner responds that in these three cases, the ALJ looked only at local or regional numbers to determine if a significant number of jobs existed that the claimants could perform.  For example in Hall, the ALJ found that proof of more than 1,350 jobs in the local economy which claimant could perform established existence of work in significant numbers.  837 F.2d at 275.

The ALJ's findings of jobs available in the national economy that Morgan could perform are far in excess of the amount found sufficient in Lirley.  There is no merit to the argument that the ALJ erred in failing to consider the factors cited by Hall, Trimiar and Jenkins.

**RECOMMENDATION**

IT IS RECOMMENDED that:   (1) the Commissioner's cross-motion for summary judgment (Rec. doc. 16) be GRANTED; and (2) Morgan's motion for summary judgment (Rec. doc. 15) be DENIED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 9th day of February, 2015.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**